UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON MCKINNEY, and ) | |
| NICOLE ROMAN, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | 1:14-cv-02124-RLY-DML |
| vs. ) | |
| ) | |
| DONTONIO NIBBS, individually, and the ) | |
| INDIANA STATE POLICE ) | |
| DEPARTMENT, ) | |
| ) | |
| Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Jason McKinney and Nicole Roman, served as President and Treasurer, respectively, of the Ben Davis Cadet Football Association ("BDCFA") from 2008-2011. In 2011, Indiana State Police Detective Dontonio Nibbs began an investigation into possible theft from the BDCFA, which culminated in the arrest of McKinney and Roman for, *inter alia*, corrupt business influence and theft on August 13, 2012. Following the special prosecutor's dismissal of all charges against them, Plaintiffs brought the present lawsuit.

In their Second Amended Complaint, Plaintiffs allege that Detective Nibbs made false statements in an affidavit which caused them to be arrested and prosecuted without probable cause. They further allege that Detective Nibbs withheld exculpatory evidence, manufactured inculpatory evidence, and made defamatory statements relating to the Plaintiffs' alleged theft of funds from the BDCFA. They bring claims for false arrest and

1

malicious prosecution under 42 U.S.C. § 1983, and defamation and libel per se under Indiana law. They also seek punitive damages.

On March 17, 2016, Defendants filed a Motion for Summary Judgment. Plaintiffs limited their Response to their Section 1983 malicious prosecution claim. Plaintiffs' failure to respond to Defendants' arguments with respect to their claims for false arrest, defamation, and libel per se results in waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' claims for false arrest, defamation, and libel per se is **GRANTED**. The court now turns to the merits of Plaintiff's malicious prosecution claim.

**I.     Background**

    **A.     The BDCFA**

1. The BDCFA is a not-for-profit youth football organization. (Filing No. 71-7, Declaration of Dontonio Nibbs ("Nibbs Dec.") ¶ 6).
2. Detective Nibbs was familiar with the BDCFA because he served as a volunteer coach for the fall season of either 2008 or 2009. (*Id.*).
3. In early 2011, Detective Nibbs heard allegations about money being stolen from the BDCFA. His sergeant gave him permission to investigate. (*Id.* ¶ 5).

    **B.     Detective Nibbs Begins an Investigation**

4. In March 2011, Detective Nibbs interviewed Delbert Mimms. Mimms served as Vice-President of the BDCFA from 2008-2011, but was voted off. (*Id.* ¶¶ 7, 9). He reported he had seen bills that were past due and disconnect notices in the post-

office box for the league. (*Id.* ¶ 11). He also reported that he asked McKinney and co-Treasurers, Jessica Bradley and Roman, to bring bank statements and records to a meeting which occurred at the end of the 2010 season. (*Id.* ¶ 10). Instead, they provided a summary report in a word document listing total expenses for 2010 as $34,482.43 and total deposits of $37,337.70. Mimms provided the summary to Detective Nibbs. (*Id.*).

5. Mimms also reported that McKinney had a $250,000 judgment against him for breaking a police officer's jaw. (*Id.* ¶ 11).

6. On March 15, 2011, through a grand jury, Detective Nibbs obtained a subpoena for the BDCFA bank records at Fifth Third Bank. (*Id.* ¶ 13).

7. From 2008-2010, he discovered multiple checks written to McKinney, with the authorized signature as McKinney, which were endorsed by McKinney and cashed. (*Id.* ¶ 15). There were also checks written to Roman, endorsed by Roman, which were either cashed at Fifth Third Bank or deposited by her into her bank account. (*Id.*).

8. To get a clearer picture of the transactions, he subpoenaed the bank records of McKinney and Roman. (*Id.* ¶ 16).

9. From 2008-2011, Detective Nibbs identified forty-nine (49) BDCFA checks totaling $28,049.00 that were written to McKinney or Roman and authorized by McKinney and/or Roman for which he could not find supporting documentation. (*Id.* ¶ 15; Filing No. 71-3, Affidavit of Probable Cause ("Probable Cause Aff.") at 12-19). Of those BDCFA checks, seventeen (17) were for $500 or more, eight (8)

were for $1,000 or more, and three (3) were for $2,000 or more. (*See* Probable Cause Aff., Attachment A: Summary of Transactions).

10. Roman acknowledged her signature on the checks, but indicated she did not know what the checks were used for. She also acknowledged that the checks were deposited into her personal bank account. (Nibbs Dec. ¶ 47).

    C.    **BDCFA Documents**

11. Plaintiffs testified they dropped off four boxes of BDCFA documents at Jackie Butler's office, some of which contained exculpatory information. (Filing No. 78, Affidavit of Jason McKinney ("McKinney Aff.") at 1; Filing No. 79, Affidavit of Nicole Roman ("Roman Aff.") at 1). At that time, Butler represented McKinney and Roman. (Nibbs Dec. ¶ 18).

12. Neither McKinney nor Roman made copies of the documents prior to dropping them off at Butler's office. (Filing No. 71-5, Deposition of Jason McKinney ("McKinney Dep.") at 53, 58; Filing No. 71-6, Deposition of Nicole Roman ("Roman Dep.") at 36, 37).

13. Indianapolis Metropolitan Police Officer Brian Morris went with Detective Nibbs to Butler's office to pick up the records. Detective Nibbs picked up one box and one crate from Butler's office, along with other documents he had subpoenaed. (Nibbs Dec. ¶ 19).

14. Detective Nibbs testified he signed a document indicating that he had picked up the documents. (*Id.*).

15. The documents were shown to Special Prosecutor Barry Brown and retained in the grand jury evidence room.  (*Id.* ¶¶ 20-21).

16. Plaintiffs believe Detective Nibbs destroyed documents contained within those boxes.  (McKinney Dep. at 61-62; Roman Dep. at 66-67).

17. Plaintiffs' attorney was provided copies of the documents on a disc, with the exception of the league registration forms because they contained confidential information about the children.  (Nibbs Dec. ¶ 22).

18. The only document Roman identified that was not on the disk produced by the state in the criminal case was a printout of an Excel spreadsheet that she and Bradley compiled concerning league expenses.  (Roman Dep. at 39, 64, 66).

19. Roman testified that although she and Bradley produced the Excel spreadsheet, she could not locate it on a computer or a disk.  (*Id.* at 39-41).

### D.   Interviews of Board Members

20. In November 2011, Detective Nibbs interviewed other BDCFA board members.  (Nibbs Dec. ¶ 24).

21. Bryan Hertz, the new Vice-President of the BDCFA, explained that purchases are made for the league by the members.  (*Id.* ¶ 25).

22. He also explained that board members are not paid for their time or services, but are allowed to be reimbursed if they make a purchase on behalf of BDCFA and a receipt is provided.  (*Id.* ¶ 26).

23. Bradley reported that Board approval was required for a purchase of over $1,000. (*Id.* ¶ 30). Board member Loretta Fleming confirmed that McKinney would not have the authority to write himself a check for over $1,000. (*Id.* ¶ 50).

24. Bradley also informed Detective Nibbs that it would be normal for board members to get $300-$400 in cash withdrawals from the BDCFA bank account at Fifth Third Bank to be used for change at league registration sessions. Because the BDCFA did not have a debit card, the money was withdrawn by a board member writing a check to themselves. (*Id.* ¶ 31).

25. Only Bradley, McKinney, and Roman had check-writing authority. (*Id.* ¶ 32).

26. Bradley also told Detective Nibbs that it would be unusual for a board member to write a check for thousands of dollars without providing a receipt. (*Id.* ¶ 33).

27. From Roman, Detective Nibbs learned that she and McKinney were in a relationship and lived with one another. (*Id.* ¶ 36).

28. Roman also disclosed that McKinney's payroll checks were deposited into her bank account. (*Id.* ¶ 46). Roman explained McKinney used her account because the account he had went into collections. Detective Nibbs noted that her explanation was inconsistent with what he had learned from Mimms about the large civil judgment against McKinney. (*Id.*).

   **E.   Specific Transactions**

29. On April 11, 2008, a BDCFA check for the amount of $3,400 was authorized by McKinney and Roman and cashed. (Probable Cause Aff., Attachment A). Both McKinney and Roman admit they withdrew this money from the BDCFA bank

6

account because they received a letter from the IRS stating that it was going to freeze the league's bank account because of missing tax returns. (Roman Dep. at 55-56; McKinney Dep. at 84-85). Plaintiffs explained that they took the cash from the bank so they would have operating money if the IRS froze the accounts. (*Id.*). They kept the money in a safe at home until the matter with the IRS was straightened out. (*Id.*).

30. On October 29, 2009, Roman admits that she wrote herself a check for $50 from the BDCFA account, which she cashed at Fifth Third Bank. (Roman Dep. at 62). She claims she did this because she left her debit card at home that day and needed gas money. According to Roman, she reimbursed the league for the money. (*Id.*).

31. McKinney withdrew $3,250 in cash from the BDCFA bank account on September 1, 2010. The check was then deposited into a bank account owned by Michael Dean. (Nibbs Dec. ¶ 41). McKinney's mother, Candice McKinney, asked McKinney to loan Dean money from the BDCFA account so Dean could put a down payment on a home. Candice was Dean's real estate agent. (*Id.* ¶ 42).

32. None of the BDCFA board members were aware of the loan to Dean. (*Id.* ¶ 44).

   **F.   Tax Records**

33. Detective Nibbs also subpoenaed the tax records for McKinney and Roman.

34. Records from the Indiana Department of Revenue showed no income tax returns on file for McKinney for a couple of years and a reported income of only $3,316 on a return he did file. Detective Nibbs found this unusual because Roman

informed him that McKinney worked in construction and also for his mother. (*Id.* ¶ 57).

35. In his deposition, McKinney admitted that he did not file tax returns for the years 2008 and 2009. (McKinney Dep. at 92).

36. Roman's Indiana Income Tax records also showed suspicious activity. For example, in 2009, her reported income was $29,865.00, but the deposits in her account totaled approximately $57,494.22. (*Id.* ¶ 58).

### G. Plaintiffs' Arrest

37. On August 13, 2012, Detective Nibbs finalized and signed the Information and an Affidavit for Probable Cause memorializing the steps he took in his investigation of McKinney and Roman. (Nibbs Dec. ¶ 60).

38. Special Prosecutor Brown signed and approved the Information and Affidavit of Probable Cause. (*Id.*).

39. That same day, the court found probable cause and issued an arrest warrant for the Plaintiffs. (*Id.* ¶ 61).

40. They were arrested that day and charged with corrupt business influence and theft. (*Id.*; Filing No. 71-11, Criminal Docket Sheet at 1-2). In addition, McKinney was also charged with failing to file tax returns. (Criminal Docket Sheet at 2).

### H. Charges are Dismissed

41. In June of 2013, a new attorney representing Plaintiffs charged that the discovery provided in the criminal matter did not include all of the documents that Butler

gave Detective Nibbs. (*Id.* ¶ 63; *see also id.*, Ex. H-2, E-mail correspondence between the parties).

42. Special Prosecutor Brown offered an open file review of all documents in the State's possession. (*Id.*, Ex. H-2 at 3). It is not clear from the record if defense counsel accepted the offer.

43. On July 16, 2013, Special Prosecutor Brown dismissed most of the charges against McKinney and Roman over that discovery dispute. The final charge for conversion was dismissed against Plaintiffs on August 27, 2013. (Nibbs Dec. ¶ 65; Criminal Docket Sheet at 3).

## II. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quotation marks and citation omitted). In other words, to

survive summary judgment, the non-movant must present "definite, competent evidence to rebut the motion." *Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693, 699 (7th Cir. 2002) (internal quotation marks and citation omitted).

### III.  Discussion

A Section 1983 malicious prosecution claim requires a plaintiff to demonstrate that: (1) he satisfied the requirements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty. *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014). Under Indiana law, a cause of action for malicious prosecution consists of the following elements: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in plaintiff's favor. *Id.* (citation and internal quotation marks omitted).

Defendants argue they are entitled to summary judgment because Detective Nibbs had probable cause to bring charges against the Plaintiffs. Probable cause in the context of a malicious prosecution claim "exists when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged." *Glass v. Trump Indiana, Inc.*, 802 N.E.2d 461, 466-67 (Ind. Ct. App. 2004) (citing *Conwell v. Beatty*, 667 N.E.2d 768, 778-79 (Ind. Ct. App. 1996)). Moreover, "a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution." *Id.* at 467 (citing *Conwell*, 667 N.E.2d at 768). In the present case, a judicial

determination of probable cause was made in the criminal case against Plaintiffs by the Marion Superior Court and arrest warrants were issued. (Criminal Docket Sheet at 3). To rebut the presumption, Plaintiffs must show that "the finding of probable cause was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing." *Glass*, 802 N.E.2d at 467.

Plaintiffs attempt to overcome the presumption of probable cause by arguing that they provided exculpatory evidence to Detective Nibbs prior to his preparation of the probable cause affidavit. For example, their mirror-image affidavits state, in relevant part:

> Nicole Roman and I turned over four boxes of documentation and/or evidence to Detective Nibbs through our attorney, Jackie Butler. Contained in said boxes were documents, receipts, and other evidence which provided explanation for the transactions which Detective Nibbs was calling into question and would have provided exonerating evidence with respect to myself and Ms. Roman with respect to the counts regarding theft and/or misappropriation of funds from the BDCFA. This evidence was not reflected in the Probable Cause Affidavit prepared by Detective Nibbs, nor were the facts supported by this evidence reflected in said Probable Cause Affidavit
> . . . .

(McKinney Aff. at 1; *see also* Roman Aff. at 1). Based on this evidence, they reason, a jury could find that Detective Nibbs' "probable cause affidavit was erroneous and invalid, thereby resulting in a lack of probable cause for both the arrest and prosecution." (Filing No. 76, Plaintiffs' Response at 8).

Plaintiffs fail to overcome the presumption of probable cause for two reasons. First, Plaintiffs were not present to witness what was provided by Butler to Detective Nibbs and Officer Morris. (McKinney Dep. at 53, 58; Roman Dep. at 36, 37). Butler

11

may have consolidated the four boxes into two. Whatever occurred, Plaintiffs have failed to provide any evidence, such as an affidavit from Butler, to dispute the fact that Detective Nibbs picked up one box and one crate of documents from Butler.

Second, Plaintiffs presented no evidence to substantiate their conclusory assertion that the boxes of documents they gave Butler would have proven they did not steal money from the BDCFA. In her deposition, Roman testified that the only document missing from the State's discovery in the underlying criminal case was a printout of a spreadsheet of league expenses that she and Bradley had compiled on a computer using Microsoft Excel. (Roman Dep. at 38, 39, 64, 66). Roman testified she worked on the spreadsheet on her work and home computer. (*Id.* at 39, 41). Yet, she could not locate nor access the document electronically on either computer. (*Id.* at 39-41). She also testified she "could have possibly" emailed the spreadsheet to Bradley, but could not find that email either. (*Id.* at 40). If this evidence was truly exonerating, one would think she could have located it. At any rate, Plaintiffs have not provided anything in the record that supports their conclusion that the boxes of documents contained exonerating evidence.

In the absence of such evidence, the court finds, as a matter of law, there was probable cause to arrest Plaintiffs, at the very least, for the crimes of theft based on the BDCFA records, the bank records, and interviews of current and past BDCFA board members. Detective Nibbs' investigation reflected that Plaintiffs were writing themselves checks from the BDCFA account and the board was unaware of the transactions. At the same time, Roman's bank account showed deposits greatly exceeding her income; yet, curiously, BDCFA's bills went unpaid. Detective Nibbs

attempted to match the transactions with receipts from the BDCFA records, but was unable to substantiate forty-nine (49) of the checks totaling $28,049.00 written to McKinney or Roman and authorized by McKinney and/or Roman as being written for league expenses. And significantly, Plaintiffs do not dispute three of the charged transactions. (*See* Findings of Fact ## 29-31).

Because there was probable cause to arrest the Plaintiffs, their malicious prosecution claim fails as a matter of law. Defendants are therefore entitled to summary judgment on Plaintiffs' malicious prosecution claim.

## IV. Conclusion

Plaintiffs failed to raise a genuine issue of material fact with respect to the claims alleged in their Second Amended Complaint. Therefore, Defendants' Motion for Summary Judgment (Filing No. 70) must be **GRANTED**.

**SO ORDERED** this 27th day of October 2016.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.